**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION**

PAIRPREP, INC. d/b/a OPTICSML,  )
)
        Plaintiff,  )
)
     v.  )   Case No.  2:21-cv-00057
)
ASCENSION DATA AND ANALYTICS, LLC,  )   **JURY TRIAL DEMANDED**
REIDPIN LLC, ROCKTOP PARTNERS LLC,  )
URSUS HOLDINGS LLC,  )
)
        Defendants.  )
)

## COMPLAINT

Plaintiff Pairprep Inc., d/b/a OpticsML ("OpticsML"), by its undersigned counsel, hereby complains against Defendants Ascension Data and Analytics, LLC (individually, "Ascension"), Reidpin LLC (individually, "Reidpin"), Rocktop Partners LLC (individually, "Rocktop"), Ursus Holdings LLC (individually, "Ursus") (collectively, "Defendants"), and alleges as follows:

## INTRODUCTION AND GENERAL ALLEGATIONS

1.    Defendants transact business in the notorious arena of distressed consumer credit markets.  In particular so called nonperforming residential mortgages with various categories of defects, compliance failings, or other collateral deficiencies.  Specifically, Defendants acquire billions of dollars of these distressed loans, manage, negotiate their sale to subsequent buyers and/or oversee their actual liquidation.

2.    Founded in 2014, Defendants shortly thereafter recognized that to dramatically and exponentially grow their businesses, they needed the ability to more quickly and accurately perform due diligence on large pools of multiple mortgage loans. With this capability, which the

1

Defendants lacked, they understood they could better and more accurately value newly purchased pools of loans, purchase substantially larger pools of loans, and solve issues with problematic loans more quickly, enabling institutional investors to obtain higher profits.  Due to incredibly high amounts of data involved in the purchase of pools of mortgage loans, Defendants knew that having such a technological platform that could provide near real time, optimal due diligence technology for mortgage loans which would be highly valuable and critical to their growth and success.

3.     Plaintiff OpticsML specializes in technology containing source code, such as machine learning source code, user-interface source code and associated tools, and creating associated documentation, designs, drawings, models, architectures, protocols, formulas and algorithms.   Moreover, OpticsML had developed technology within the education sector, developing a platform for creating and managing digital educational content.   In this regard OpticsML focused on and gained expertise in applying Machine Learning and Natural Language Processing, both subsets of Artificial Intelligence, to educational materials.   The OpticsML technology referred to herein will be referred to as the "OpticsML Trade Secrets."

4.     In December 2016, Defendants recognized they were unable to adequately develop technology-based optimization for mortgage due diligence and, therefore, sought a partner to develop the technology Defendants needed.  Thus, Defendants approached OpticsML with the request to apply the OpticsML Trade Secrets and expertise to the mortgage industry.

5.     Thereafter, Defendants and OpticsML proceeded to engage in negotiations in late 2016 and early 2017.  By March 2, 2017, a Master Service Agreement ("MSA") was signed.  A copy of the MSA is attached as **Exhibit A**.

6.     In the MSA, the parties expressly agreed that OpticsML exclusively owned all intellectual property developed in whole or in part by OpticsML in providing the services to the

2

Defendants, including the OpticsML Trade Secrets (expressly defined as "Work Product").  Under the MSA OpticsML is identified as "Service Provider" and Defendants are identified as "Client."

> **Section 6(a).** Subject to the terms and conditions of this Section, any copyrightable works, ideas, discoveries, inventions, patents, products, or other information (collectively the "Work Product") developed in whole or in part by Service Provider in connection with the Services shall be the exclusive property of Service Provider, and Client agrees to execute all documents necessary to confirm or perfect the exclusive ownership of Service Provider to the Work Product, upon request.

Defendants agreed that they would enter and pay OpticsML for an exclusive license for use of the "Work Product" after the initial "Build-Out" of three to four months was complete.

> **Section 6(c).** In consideration of the foregoing, upon completion of the Build-Out stage of development, or at any other time mutually agreeable to the parties, Service Provider and Client agree to negotiate in good faith the terms of an exclusive licensing agreement that is fair and reasonable in scope, duration, and compensation. In such a licensing agreement, the Service Provider agrees to negotiate with the Client an exclusive license to use, sell, and offer for sale the Services to the mortgage industry, including but not necessarily limited to mortgage lenders, servicers and real estate funds.

7.    Pursuant to the MSA, OpticsML provided the OpticsML Trade Secrets to Defendants in good faith throughout 2017, 2018 and into 2019, which enabled OpticsML's servers to apply Machine Learning and Natural Language Processing to mortgage documents supplied by Defendants.  The sharing of OpticsML Trade Secrets enabled Defendants to create a "due diligence and analytics platform" (the "Platform") centered around Machine Learning and Natural Language Processing to conduct its business, which it marketed to investors and publicly on its website:

> Rocktop and its affiliates have developed artificial intelligence and machine learning applications and a proprietary database of curative outcomes on over 100,000 legal related title, compliance, and collateral defects to optimize our due diligence, underwriting and pricing capabilities. This platform allows Rocktop to price loan pools more precisely by quickly identifying optimal curative paths that enable us to estimate the time, cost, and complexity involved in resolving essentially any title, collateral or

compliance issue. Rocktop's technical platform and analytical methodologies provide the scale and systems sophistication to process high volumes of loans quickly and accurately.[1]

8.    Despite the language and agreement in the MSA, and despite multiple and repeated requests by OpticsML to do so, Defendants repeatedly refused to enter into the exclusive license agreement for the developed "Work Product" as they had agreed to do under the terms of the MSA.

9.    Instead, on July 26, 2019 Defendants sent a letter to OpticsML falsely and libelously claiming that OpticsML was in Default under the MSA in light of a widely publicized data security incident.[2]

10.    In that July 26 2019 correspondence Defendants declared "Pursuant to Section 8(b) of the Agreement [MSA], this letter shall serve as written notice of the occurrence of the Default and the automatic termination of the Agreement. . . . on August 8, 2019 (the "***Termination Date***"). (Emphasis in original).[3]

11.    Accordingly, subject to Defendants own unilateral actions the MSA terminated on August 8, 2019.   However, Defendants' obligation to negotiate in good faith and pay for an exclusive license to the Work Product/OpticsML Trade Secrets continues, despite said termination. Because, notwithstanding Defendants unilateral termination of the MSA on August 8, 2019 Section 6 **Intellectual Property** of the MSA, which contains the requirement that Defendants ". . . negotiate in good faith the terms of an exclusive licensing agreement that is fair and reasonable in scope, duration, and compensation," explicitly survives any termination of the MSA.  Sec. 6(e)

---

[1] www.rocktoppartners.com, Investment Strategy

[2] https://www.komando.com/security-privacy/millions-of-loan-and-mortgage-records-exposed-in-another-massive-data-breach/536809/

[3] In the same July 26, 2019 correspondence Defendants also falsely and libelously made the wholly unsubstantiated claim that "OpticsML is insolvent".  This false accusation was made in an attempt to wrongfully and tortiously attempt to claim ownership of the aforementioned Work Product under the terms of the MSA.  At no time has OpticsML ever declared bankruptcy and or been declared insolvent.  Such allegation was and is unsupported and false.

states as follows: "This Section shall survive the termination of this Agreement."[4]

12.     As a result, from at least that moment forward Defendants have used and continue to use and misappropriate the Work Product as identified under the MSA and OpticsML Trade Secrets without any legal basis or authorization.

13.     OpticsML only provided Defendants access to the Work Product and OpticsML Trade Secrets as part of its obligations under the MSA.  The requirement of the exclusive license protected OpticsML's proprietary interests. And now that the MSA has been fully terminated, and Defendants have not obtained an exclusive license to the Work Product under the MSA, any and all rights Defendants had to use the OpticsML have expired and Defendants are in continual breach of the MSA.

## PARTIES

14.     Plaintiff Pairprep Inc. d/b/a OpticsML ("OpticsML") is a Delaware corporation with its principal place of business at 1 Domidion Ct., Middletown, New Jersey.

15.     Defendant Rocktop Partners LLC ("Rocktop") is a Texas limited liability company with its principal place of business at 701 Highlander Boulevard, Suite 200, Arlington, Texas.

16.     Defendant Reidpin LLC ("Reidpin"), is a Delaware limited liability company with its principal place of business at 701 Highlander Boulevard, Suite 200, Arlington, Texas.

17.     Defendant Ascension Data & Analytics LLC ("Ascension") f/k/a Ursus Advisors LLC is a Delaware limited liability company with its principal place of business at 701 Highlander

---

[4] A review of the entire MSA reveals that the parties agreed that certain sections of the Agreement would survive termination of the agreement while others would not. For instance, Section 6 **Intellectual Property**, discussed above explicitly survives any termination of the agreement.  Similarly, Section 7 **Confidentiality** contains the same language as Sec. 6 indicating that its provisions survive termination of the Agreement.  (*See* Sec. 7(f)). Also, Section 12 **Survival** indicates that representations and warranties were intended by the parties to survive termination of the Agreement. No other Sections of the MSA survive(d) Defendants' termination of the Agreement.

Boulevard, Suite 200, Arlington, Texas.

18.     Defendants Ursus Holdings LLC ("Ursus") is a Delaware limited liability company with its principal place of business at 701 Highlander Boulevard, Suite 200, Arlington, Texas.

19.     Upon information and belief both Defendants Ascension and Rocktop are wholly owned by Defendant Reidpin.

## JURISDICTION AND VENUE

20.     This Court has jurisdiction under 28 U.S.C. § 1332 based on diversity because OpticsML and the Defendants are citizens of different states and the amount in controversy exceeds the sum value of $75,000.

21.     This Court also has subject matter jurisdiction in this matter pursuant to the Federal Defend Trade Secrets Act ("DTSA"), 18 U.S.C. §§ 1836-1839 *et seq.* and 28 U.S.C. §§ 1331 and 1343.  The Court also has supplemental jurisdiction over the state law claims alleged in this Complaint pursuant to 28 U.S.C. § 1367.

22.     Venue in this district is proper under 28 U.S.C. §1391(b)(1), (2) and (d). All Defendants are subject to personal jurisdiction in this Court as they are residents of the State of Texas and/or have their principle places of business within the State of Texas and upon information and belief have at least minimum contacts with and within the Eastern District of Texas.  Upon information and belief, Defendants all have significant contacts with and do business in this District.  Defendants have purposefully directed their activities that form the basis for this action towards this judicial district including, by way of example and not limitation, acquiring, managing, and repackaging mortgages that were originated within this District and/or that cover property located within this District. Moreover, upon information and belief,

6

Defendants have wrongfully used and misappropriated OpticsML's Work Product and OpticsML Trade Secrets in performing due diligence and investigation into said mortgages.

**JOINT ENTERPRISE**

23.     At all times relevant hereto Defendants jointly and individually operated as a Joint Enterprise with one another under Texas law, and represented to the public through marketing and advertisements that they were one in the same.  Upon information and belief all Defendants were involved in an express or implied agreement, working towards the common investment and pecuniary goals of the enterprise, with each having the ability to direct and control the enterprise. As such all are liable for the injuries suffered by OpticsML herein.

24.     By way of example, and not limitation, all Defendants were jointly and expressly engaged in the common pecuniary purpose of the acquisition of large pools of performing and nonperforming first lien residential mortgage loans with title defects, compliance issues, or other collateral deficiencies, and then contracting with entities such as OpticsML, or whomever else required, to meet and achieve this common purpose.

25.     At all times relevant hereto there was never any distinction made in word or in deed between Defendants Ascension f/k/a Ursus Advisers, Ursus, Rocktop, or Reidpin.  Upon information and belief, common officers and employees worked for and in concert with all Defendants.  By way of example, and not limitation, at times the same individual(s) representing the Defendants would be present on an email chain with two different email addresses, one containing the domain "@ursusholdings.com," the other "@rocktoppartners.com."   In addition, during years of email correspondence between OpticsML and Defendants, communications and interactions would take place between individuals purportedly associated with one or more of the several Defendant entities.

7

26.     In addition, as set forth above, all Defendant entities share the exact same address.

## ADDITIONAL ALLEGATIONS

### A.     OpticsML's Unique, Proprietary Technology

27.      OpticsML has developed the technical knowledge and resources to scale large amounts of data with a focus on PDF documents.

28.     Both of the OpticsML's founders, Sean Lanning ("Mr. Lanning") and John Brozena ("Mr. Brozena"), gained technical work experience at some of the world's largest financial institutions such as Goldman Sachs and Deutsche Bank, and national defense firms such as Boeing and Booz & Company (now a part of PwC).  Not only had they both been programmers since their early teens, they also had degrees from some of the most prestigious universities in the world, as both have master's degrees from Columbia University, where they met.

29.     The specific OpticsML Trade Secrets at issue in this litigation – OpticsML's proprietary and industry-leading platform containing applications, source code, tools, documentation, designs, drawings, models, architectures, protocols, formulas and algorithms, procedures, data dictionary, and its data compilations – were developed by its founders, Messrs. Lanning and Brozena, while leading OpticsML from 2014-2019.

### B.     Defendant Rocktop Is a Leader In Purchasing Distressed Consumer Credit Loans

30.     Defendant Rocktop is an alternative asset manager that specializes in distressed consumer credit markets; in particular, the acquisition of large pools of performing and nonperforming first lien residential mortgage loans with title defects, compliance issues, and other collateral deficiencies.  Such issues, defects, and deficiencies are discovered in the mortgage documents accompanying the purchase of a pool of mortgage loans.  Rocktop is a SEC-registered

investment adviser that provides investment advisor and asset management services to the Rocktop private equity funds and separately managed accounts that were first launched in 2014. ("Funds") Defendants Ascension and Ursus are wholly-owned affiliates of Rocktop.  Rocktop enters into a servicing agreement with Ursus to provide services, including identifying mortgages for acquisition, curating title with respect to mortgages, and liquidating mortgages on behalf of the Funds. Ascension Data and Analytics is a wholly-owned affiliate of Rocktop that provides reports on title and collateral documents.

31.     Rocktop purchases pools of loans, of which a substantial portion consists of non-performing loans.  A substantial percentage of these loans will be liquidated through foreclosure proceedings, sales or other means.

32.     Rocktop and its affiliates operate under a shared services model wherein they pay one another for services provided by one another.  In addition, Rocktop has shared legal and accounting services in a manner that disregards corporate distinctions between the companies.

33.     Rocktop has a dominant position in the market for pools of distressed consumer credit markets loans with title, compliance, and collateral defects that are discovered within mortgage documents, and since the start of discussions with OpticsML in late 2016 until today, Rocktop has grown from 18,099 in loans to more than 70,720, with the total unpaid principal loan balance acquired growing to $7,469,364,710, as has been disclosed on its website.[5]

34.     As part of Rocktop's and its family of companies' aggressive plan to grow their asset base to raise profits, it realized it needed more advanced capabilities to identify title, compliance, and collateral defects at scale.

---

[5] www.rocktoppartners.com

## C.      Defendants Seek a Partnership with OpticsML

35.      Rather than take on the risk of failure and large development costs of internally developing a solution, which would fall far outside of its core competencies in the mortgage industry, Defendants chose to partner with a third party who already had the infrastructure in place and technology developed to achieve this significant result.  Defendants were introduced to the OpticsML founders through a mutual connection.

36.      Although OpticsML had been focused in the education industry in its first few years, it was interested in partnering with an established company in another industry to utilize its unique proprietary technology.

37.      While a partnership in the mortgage industry would constitute a pivot from the education sector, OpticsML quickly realized that the OpticsML Trade Secrets could be adapted and developed for the mortgage market since it dealt with similar content as the education sector, namely paper documents and PDFs.

38.      OpticsML could provide Defendants with a clearly valuable competitive advantage by applying Machine Learning and Natural Language Processing, both subsets of Artificial Intelligence, to mortgage documents.

39.      Defendants were unsure the technology to be developed by OpticsML could be applied to the mortgage industry because no other vendor Defendants met with had expressed the ability to meet these needs.  OpticsML possessed a unique and not generally known set of trade secrets.

## D.      Details of the MSA and Subsequent Relationship

40.      The parties subsequently negotiated the MSA, attached as Exhibit A.  The MSA provided for a "Build-Out" stage for three to four months for a service platform in which OpticsML

was to be paid a small monthly fee for applying its technology to create a due diligence and analytics platform (the "Platform").

41.     The MSA prohibited Defendants from reverse engineering OpticsML's models or the output of those models, including any user interface for the purpose of leveraging machine learning and natural language processing on mortgage documents, or otherwise using OpticsML's confidential information to develop their own products for their exclusive ownership.  In particular, MSA Section 6(a) required Rocktop and Defendants:

> Subject to the terms and conditions of this Section, any copyrightable works, ideas, discoveries, inventions, patents, products, or other information (collectively the "Work Product") developed in whole or in part by Service Provider in connection with the Services **shall be the exclusive property of Service Provider, and Client agrees to execute all documents necessary to confirm or perfect the exclusive ownership of Service Provider to the Work Product.** (Emphasis Added).

42.     Given the importance of the development and the acknowledgement of the difficulty to teach machines to both see and read mortgage documents to extract key data and insights, Defendants ensured in the MSA that, within the next few months, the terms of an exclusive license were to be negotiated in good faith, so that no other mortgage participants would have the ability to obtain a competitive advantage.  The expectation of obtaining fair market compensation for its Intellectual Property was an important requirement for OpticsML to enter into the MSA.  In particular, MSA Section 6(c) required Defendants:

> In consideration of the foregoing, upon completion of the Build-Out stage of development, or at any other time mutually agreeable to the parties, Service Provider and Client agree to negotiate in good faith the terms of an exclusive licensing agreement that is fair and reasonable in scope, duration, and compensation.

43.     Although, at all times OpticsML dealt directly with Rocktop, at the signing of the MSA, Rocktop directed its affiliate, Ascension, to execute the MSA.  The signature provided was

from the CEO of Ascension, Jason Pinson, who was also the CEO of Ursus Holdings and Rocktop Partners.

44.     In recognition of the limited scope of the "Build-Out" stage and future partnership, upon completion of the "Build-Out" stage, the parties expressly agreed to negotiate an exclusive license for the Platform that would have a reasonable scope, duration, and compensation to OpticsML.

45.     OpticsML fully complied with its contractual obligations pursuant to the terms of the MSA.

46.     Defendants immediately saw the immense value in OpticsML's technology for use in the Platform.  Just weeks into the Buildout Phase, Brett Benson, President of Ascension, stated in an email, "[w]e'd like to discuss expanding the partnership with you guys as we've mentioned in the previous conversations."

47.     On March 28, 2017, with OpticsML meeting the expectations of the MSA, Messrs. Lanning and John Brozena met with the executive leader of Defendant Rocktop, Jason Pinson, and Defendant Ascension, Mr. Benson, in New York City.

48.     At this March 28, 2017 meeting, in response to questions on the specific details of the OpticsML Trade Secrets, OpticsML requested that the parties discuss the exclusive license.

49.     Defendants told OpticsML that it would not discuss the exclusive license at that time, suggesting that such discussions occur in December or later.

50.     The Defendants newly proposed timing of December 2017 (or later) to negotiate the fair exclusive license required by the MSA went against the timing of the MSA signed just weeks earlier, which specified that the exclusive license was to be negotiated within four months of March 2017 at the latest – by July 2017.

51.     While OpticsML was still excited about the partnership opportunity sold to them, this later proved to be the first indication something was amiss in Defendants' intentions towards OpticsML.

52.     Nonetheless, OpticsML continued to work with Defendants in good faith pursuant to their contractual agreement to develop the Platform.

53.     OpticsML developed and owns numerous trade secrets that it created during its partnership with Rocktop, including highly valuable proprietary software, algorithms, models, data, reports, forms, data sources, know-how, techniques, and methods relating to various aspects of machine learning and natural language processing for mortgage documents and other areas.

54.     The OpticsML Trade Secrets include software applications containing machine learning source code, user interface source code, user interface proofing tool, search tool, speed tagger tool and page grader tool, source code developed that is necessary or useful to the full utilization and enjoyment of the software application, and all documentation, designs, drawings, models, architectures, protocols, formulas and algorithms.

55.     OpticsML's software developed while working with the Defendants, the "Platform," performs incredibly complex decision-making using the OpticsML Trade Secrets.  For example, nearly all mortgage documents to which the OpticsML Trade Secrets were applied were image-based and high-volume.  Enabling and teaching a machine to read pixels on a page such that it can make out words, understand the context of those words, and then find relevant information and details is extraordinarily difficult.  The vast majority of the pages were completely non-uniform, therefore, OpticsML's technology had to read pages from myriad of different servicers, title companies, and banks.  The Platform has been able to scale to a vast amount of data very quickly.

13

56.     An image of the Platform, shows an early version of how OpticsML's software, containing the OpticsML Trade Secrets, was intended to be used by Defendants for mortgage documents as part of the Platform:



### E.     OpticsML Shared Valuable Trade Secrets with Defendants as Part of the MSA

57.     OpticsML shared the OpticsML Trade Secrets and insights into how its models and software were created – such as model specifics, algorithms, and planned development details – for the purpose of creating the Platform.

58.     OpticsML led meetings with Defendants twice per week, providing all information requested by Defendants to continue to develop and refine the Platform.

59.     From the beginning of 2017 through the beginning of 2019, Defendants' employees and consultants, ranging from technical employees to upper management, continued their bi-weekly meetings to dive into the details of the technology and the innovation that OpticsML was creating in the Platform.  These details were provided by OpticsML under the belief that it was

operating pursuant to fair, mutually beneficial, and a confidential contractual partnership.  As a result, OpticsML provided Defendants' technical employees access to technical details, progress, failures, and positive results of the Platform.

60.     In short, on a continuous basis for nearly two years, OpticsML provided all of the information that Defendants needed to utilize the OpticsML Trade Secrets and deploy the Platform.

### F.     Defendants Misrepresent OpticsML's Trade Secrets and Technology as Belonging to Defendants

61.     During the 2017-2019 timeframe and as early as September 2017, Defendants began to market the Platform as its "due diligence and analytics platform" to its current and prospective investors, with the intention of raising billions of dollars in capital based on the technology being provided by OpticsML under the MSA.

62.     Defendants were only able to make these statements because of the OpticsML intellectual property being provided to Defendants as part of the MSA relationship.

63.     A screenshot of Rocktop's website in September 2017 is attached as **Exhibit B**.

64.     During this time, Rocktop sent OpticsML tens of millions of pages of mortgage documents (contained in large-scale purchases of mortgage loans from the largest financial institutions in the world) for OpticsML to process.

65.     This great number of documents went well beyond the "Proof of Concept" phase contemplated by the MSA and proof that OpticsML had developed the long-sought technology that Defendants needed to grow their business.  Such behavior rapidly increased the scope of the Rocktop-OpticsML "partnership," despite Rocktop never negotiating the license as required by the MSA.

**G.      Defendants Refuse to Abide by its MSA Obligations in Bad Faith**

66.     Defendants leveraged the MSA to take advantage of access to OpticsML Trade Secrets and proprietary technology.

67.     Defendants used the MSA to further Defendants real intended uses of the OpticsML Trade Secrets without providing just compensation.

68.     OpticsML presented successful results to Rocktop as early as July 2017, exactly when the MSA explicitly required Defendants to enter into an exclusive license with OpticsML. It was evident by this time that the scope of what Defendants needed for use on live deals – in which a large influx of mortgage documents is analyzed by a document team within a short period of time – was beyond what was discussed in the "Proof of Concept" portion of MSA, but within the phase contemplated by the exclusive license agreement pursuant to the MSA.  Rocktop needed OpticsML to expand on its early success.  As a result of Defendants' ever increasing demands, by July 2017, OpticsML's development expanded much beyond the Build-Out, and OpticsML began labeling every invoice "Continuing Custom Work" thereafter, which Defendants' management team signed off on every month.

69.     Defendants greatly benefitted from the use of the OpticsML Trade Secrets and the Platform, as they requested vast amounts of data from OpticsML.  OpticsML, after notifying Rocktop that the "Proof of Concept" phase had successfully concluded, clearly labeled in every invoice after the first four months of the "Build-Out," that the ongoing work was to be considered "Continuing Custom Work," as opposed to the Build-Out, which the executive leaders of Rocktop approved every month as distinct from the Build-Out.

70.     Even while OpticsML specifically labeled their continuing work as outside the Build-Out phase of the MSA in response to receiving more and more work from the Defendants,

16

Defendants continued to attempt to extend the Build-Out phase of the MSA to take advantage of the OpticsML Trade Secrets.  For example, in October 2017, Defendants temporarily withheld payment to OpticsML of their monthly invoice and charged a penalty under the guise that OpticsML's Build-Out phase was incomplete, while still not providing any benchmarks to decide completion pursuant to the MSA.

71.     OpticsML traveled to Dallas during the fall of 2017 to ensure that Rocktop understood that the Build-Out had been completed and to negotiate a license, but was forced to accept Rocktop's penalty in order to further the "partnership" pursuant to the MSA in reliance upon Rocktop's presumed good faith.

72.     Rocktop's refusal to enter into an exclusive license agreement had serious consequences for OpticsML, as Rocktop's monthly payment for the Build-Out phase knowingly only covered some of OpticsML's reduced salaries for its founders and other expenses after its pivot from the education section, leaving OpticsML to invest more than $300,000 in rapidly increasing server costs (which went well beyond the bounds of the MSA's Build-Out phase as Rocktop continuously requested new features).

73.     Defendant Rocktop's cumulative efforts were designed to find ways to stall further payments until Rocktop could learn OpticsML's Trade Secrets without paying a reasonable license fee for its contribution to the Platform, as required by the MSA.

74.     While Rocktop was supposed to have limited access to OpticsML's software in exchange for their initial upfront payment – meaning that greater access would require subsequent and further payment – it eventually became clear that Rocktop had no intention of negotiating the required exclusive license because that license would require higher payments to OpticsML for its critically important technology.

17

75.     Despite OpticsML meeting with Rocktop in the fall of 2017 to make it clear that all initial benchmarks were satisfied and, therefore, an exclusive license should be negotiated as in the MSA, Rocktop pushed off all such discussions for an exclusive license.

76.     In January 2018, OpticsML completed and communicated its own analysis to further prove its completion yet again.  Rocktop again pushed off negotiating an exclusive license.

77.     In May 2018, when Rocktop further expanded the Platform across Defendants' organization, Rocktop expressed satisfaction with OpticsML's development and showed OpticsML internal correspondence stating that "[t]his new machine learning tool is amazing."

78.     The updated OpticsML Platform was used across the Defendants' organizations for revenue generating purposes, such as on outgoing sales deals.

79.     For example, between February 2018 and January 2019, Rocktop sent 36 emails with a sudden demand to send new mortgage documents.  Within those emails alone, Rocktop listed out 1,881,538 documents, that needed to be processed immediately by OpticsML. Rocktop sent documents to OpticsML on 61 deals, which consisted of 50% of Rocktop's listed acquisitions since Rocktop's inception, with plans to send documents on all of their deals.

**H.     Rocktop's Focus on New Features Results in an External Security Warning, After Ignoring OpticsML's Warnings**

80.     Rocktop pushed for new features to be added to the Platform at a continuously faster rate to satiate Rocktop's need to continue to market to investors and increase profits.  Such lust for growth and progress came at the expense of other areas on which Rocktop could have and otherwise would have spent time and technical resources on, such as data security.

81.     With the Defendant's increasing requests for data and analysis resulting in onslaught of new technology requests and the delivery of tens of millions of pages containing sensitive material to OpticsML, OpticsML became concerned regarding the security standard

Rocktop was setting.  In an email sent on June 20, 2018, a founder of OpticsML felt that although OpticsML was following the security standard set by the MSA and Rocktop, the Rocktop security standard could have been improved.   A copy of this email is attached as **Exhibit C**.

82.     In this correspondence, OpticsML stated, "[s]ince we are holding on to very sensitive information (SSN, etc.), we need to get this stuff locked down."  Rocktop took no action in response to OpticsML's concerns.

83.     Additionally, despite the continuous receipt of tens of millions of pages of mortgage documents with sensitive information, the OpticsML team was never provided the opportunity to interact with Rocktop's full-time in-house security personnel in relation to security matters even despite the fact that Rocktop's wholly-owned subsidiary Ursus Holdings, unbeknownst to OpticsML, already went through a material data breach in early 2016.

## I.     Defendants Attempt to Use the External Security Warning to Pressure OpticsML to Relinquish Intellectual Property

84.     As indicated herein, Defendants never took a license to OpticsML's intellectual property, including the OpticsML Trade Secrets, as required by the MSA.

85.     Accordingly, Defendants have no right to continue to use the OpticsML Trade Secrets.

86.     Upon information and belief, Defendant Rocktop is an Investment Advisor within the meaning of Section 201(11) of the Advisors Act [15 U.S.C. § 80b-2(11)]. While Defendant Rocktop was raising and investing billions of dollars and capital based on the technology provided by OpticsML under the MSA, Rocktop was also facing pressure since they had not yet negotiated an exclusive license as required by the MSA, yet were wrongfully representing to their investors and the public that they owned the technology behind Work Product and OpticsML Trade Secrets. As a result, Rocktop threatened OpticsML that if it did not transfer its intellectual property rights

to the Work Product and OpticsML Trade Secrets developed under the MSA, Defendants would terminate the Parties relationship and take legal action purposefully designed to drain OpticsML of resources. Upon information and belief Defendants actions were motivated by the desire to avoid potential claims from and in relation to §§ 206(1) and 206(2) of the Advisers Act of 1940 [15 U.S.C. §§ 80b-6(1), (2)], and section 17(a) of the Securities Act of 1933 15 U.S.C § 77q(a) and Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78 j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5.

87.     The MSA expressly provides, as shown herein, that OpticsML owns all of the intellectual property and trade secrets under the MSA and Defendants no longer have the right to use either.

88.     Rocktop, however, used OpticsML's decision not to succumb to their demands as an excuse to misappropriate the OpticsML Trade Secrets without paying any further licensing fees.

89.     Defendants used the misappropriated trade secrets to continue to develop the Platform itself, and continues to use OpticsML's intellectual property without OpticsML's permission and despite OpticsML repeated communications that Defendants have no right to use these trade secrets.

90.     Notwithstanding this, on information and belief, Rocktop hired data scientists to use the OpticsML Trade Secrets to continue developing the Machine Learning and Natural Language Processing technology that OpticsML had been developing since early 2017.

91.     As indicated herein, in July 2019, Rocktop issued a formal demand for the rights to OpticsML's intellectual property in order to cover up both their prior and planned behavior. OpticsML refused to surrender its intellectual property since the MSA specifically states that OpticsML owns all of the Work Product it created in whole or in part.  OpticsML maintains

ownership of all of the OpticsML Trade Secrets.

92.     Pursuant to the MSA, Rocktop is not permitted to use the OpticsML Trade Secrets related to machine learning and natural language processing technology on mortgage documents. However, Rocktop continues to do so, using the OpticsML Trade Secrets in this manner and building directly on top of the trade secret platform. These trade secrets are stolen technology from OpticsML, and any subsequent development is based and enabled only via stolen trade secrets.

**J.     Defendants Obtained the OpticsML Trade Secrets and Used Them to Develop Competing Products**

93.     Defendants reviewed OpticsML's Trade Secrets as OpticsML continued to improve them for two years.  At each step, Defendants demanded intricate details of the OpticsML Trade Secrets to enable their use and disclosure within Rocktop.  OpticsML allowed such access only pursuant to the expectations of the parties that an appropriate license would be negotiated per the MSA.

94.     On information and belief, Defendants intended all along to exploit the Rocktop relationship with OpticsML to gain access to OpticsML's code, data, natural language processing knowledge, machine learning software, and user interface workflows, so that they could wrongfully take and appropriate that technology, while trying to pass it off as though Rocktop, Ascension, and Ursus had independently developed the same products.

95.     During the parties' two years of work together, Defendants adopted a hands-off approach and benefitted tremendously from OpticsML's work on the implementation of a machine learning and natural language processing Platform for Rocktop's use on production mortgage deals, on which Rocktop acquired hundreds of millions of dollars of mortgage loans for each deal.

96.     Defendants' access, use and disclosure of the OpticsML Trade Secrets is undeniable.  Rocktop had no other Machine Learning software and/or technology prior to the start

of the MSA with OpticsML.

97.     Despite this, Rocktop claimed on its website in September 2017 that: "Rocktop leverages its affiliated asset management company and dedicated law firm to streamline the delivery of curative and legal services through machine learning and a database of over 80,000 resolved title and other loan related issues."  This is a direct reference to the use of the OpticsML Trade Secrets.

98.     Similarly, Ursus Holding's website stated, "Ursus has built an automated process to scan and read loan files at post-close or acquisition to find and assess the financial impact of defects.  These defects could be title, legal, compliance, or collateral issues . . . .  Ursus has combined system integrations to enable us to: Scan, find, index, and read critical documents in the loan file.  To automatically read and interpret title data to launch any necessary curative efforts."  Ursus Holdings was directly mentioning OpticsML's technology and claiming it as its own.

99.     Unbeknown to OpticsML, Rocktop was intent on using the OpticsML Trade Secrets for itself without compensating OpticsML as required under the MSA.  For example, on February 22, 2018, Rocktop's employees and consultants added 19 feature requests.  The highest priority item labeled by Rocktop was "Search Tool UI updates: Remove the Optics Branding" as Rocktop and their investors knew that they needed to remove OpticsML's stamp on their core assets to eventually pave a way to use OpticsML's intellectual property later without proper compensation as required by the MSA's requirement to execute an exclusive license.

100.    Rocktop's 2018 job postings further demonstrate that they were planning to use OpticsML's Trade Secrets without paying just compensation.  In January 2018, Defendant Ascension started posting job applications in which the candidate was required to have "[k]nowledge and experience in advanced unstructured text analytics, natural language processing,

sentiment analysis, and text classification." The description exactly matched the types of algorithms that OpticsML had been creating and sharing with Rocktop.

101.    When OpticsML flew to Texas to meet with the Defendants' executives, Jason Pinson, Brett Benson, and Josh Harrison in February and March 2019, Rocktop showed no signs of wanting to negotiate fairly.  During this meeting, Defendants again threatened OpticsML, demanding all rights to the intellectual property and trade secrets developed by OpticsML.

102.    Josh Harrison, who is on the management committee of Rocktop, even called OpticsML founder Sean Lanning on his honeymoon on March 14, 2019 threatening to sue unless OpticsML (1) handed over the rights to its hard-earned Intellectual Property and (2) dissolved itself as a company.

103.    By this point, OpticsML had vastly exceeded the amount of work that was initially discussed, spent hundreds of thousands of dollars of its preexisting assets on the tens of millions of mortgage documents sent to OpticsML, as well as created user interfaces, workflows, and procedures for the Platform.

104.    By the summer of 2019 when OpticsML stopped its work, OpticsML had provided Rocktop with all of the following OpticsML Trade Secrets and intellectual property, which vastly exceeded what was required by the "Build Out" phase of the MSA:

- Tens of millions of predictions and labeled data on its servers created by OpticsML's software and owned by OpticsML;

- Countless screenshots of OpticsML's software and inner workings that Rocktop regularly communicated back to OpticsML via email and video calls;

- Backend code walkthroughs, processes, and workflows invented by OpticsML for the purpose of due diligence;

- Algorithm guides;

- Technical explanations;

- Raw code;

- Server infrastructure methods;

- API specifications,

- Model performance changes and details;

- Data creation procedures and inventions; and

- Hours of live usage video among their employees.

### FIRST CAUSE OF ACTION

**Trade Secret Misappropriation Under the Federal Defend Trade Secrets Act ("DTSA"),
18 U.S.C. §§ 1836-1839 et seq.**

**(All Defendants)**

105.   OpticsML incorporates all of the above paragraphs as though fully set forth herein.

106.   OpticsML owns and possesses certain trade secret, confidential, and proprietary information that is protected by the DTSA.  Such information includes the exact technology and source code utilized by the Platform.

107.   OpticsML took reasonable steps to protect and maintain the secrecy of its trade secrets and confidential information, including corporate policies and requiring Defendants and all other parties with access to agree to keep such information confidential in the MSA.

108.   OpticsML's trade secret and confidential information relates to Machine Learning and Natural Language Processing source code.

109.   The OpticsML trade secrets derive independent economic value from not being generally known to, and not being readily ascertainable through proper means by, another person who could obtain economic value from the disclosure or use of the information.

110.   In violation of OpticsML's rights under the DTSA, 18 U.S.C. § 1836, Defendants

24

misappropriated OpticsML's trade secret, confidential, and proprietary information in the improper and unlawful manner alleged herein.  Defendants' misappropriation of the OpticsML Trade Secrets was intentional, knowing, willful, malicious, fraudulent, and oppressive.

111.    As the direct and proximate result of Defendants' conduct, OpticsML has suffered and, if Defendants' conduct is not stopped, will continue to suffer severe competitive harm, irreparable injury, and significant damages in an amount to be proven at trial pursuant to 18 U.S.C. § 1836(b)(3)(B).

112.    Pursuant to 18 U.S.C. § 1836(b)(3)(A), because OpticsML's remedy at law is inadequate, OpticsML seeks, in addition to damages, preliminary and permanent injunctive relief to recover and protect its trade secrets, confidential and proprietary information and to protect other legitimate business interests.  OpticsML's business operates in a competitive market and will continue suffering irreparable harm absent injunctive relief.

113.    OpticsML is entitled to an award of exemplary damages and attorneys' fees.

### SECOND CAUSE OF ACTION

**Aiding and Abetting Trade Secret Misappropriation Under the DTSA,
18 U.S.C. §§ 1836-1839 et seq.
(All Defendants)**

114.    OpticsML incorporates all of the above paragraphs as though fully set forth therein.

115.    OpticsML owns and possesses certain trade secret, confidential, and proprietary information that is protected by the DTSA, as alleged above as Trade Secrets.  Such information includes the exact technology and source code utilized by the Platform.

116.    OpticsML's trade secret and confidential information relates to Machine Learning and Natural Language Processing source code.

117.    The OpticsML trade secrets derive independent economic value from not being

generally known to, and not being readily ascertainable through proper means by, another person who could obtain economic value from the disclosure or use of the information.

118.    In violation of OpticsML's rights under the DTSA, 18 U.S.C. § 1836, Defendants misappropriated OpticsML's trade secrets, confidential, and proprietary information in the improper and unlawful manner alleged herein.  Defendants' misappropriation of the OpticsML Trade Secrets was intentional, knowing, willful, malicious, fraudulent, and oppressive.

119.    Defendants aided and abetted the misappropriation by the other Defendants within the meaning of 18 U.S.C. § 1836 to the benefit of Defendant Rocktop Partners.

120.    As the direct and proximate result of Defendants' misappropriation, OpticsML has suffered damage within the meaning of 18 U.S.C. § 1836(b)(3)(B)(i)(I) in an amount not yet determined and, if Defendants' conduct is not stopped, OpticsML will continue to suffer irreparable injury and significant damages in an amount to be proven at trial.

121.    Pursuant to 18 U.S.C. § 1836(b)(3)(A), because OpticsML's remedy at law is inadequate, OpticsML seeks, in addition to damages, preliminary and permanent injunctive relief to recover and protect its trade secrets, confidential and proprietary information, and to protect other legitimate business interests.  OpticsML's business operates in a competitive market and will continue suffering irreparable harm absent injunctive relief.

122.    OpticsML is entitled to an award of exemplary damages and attorneys' fees.

### THIRD CAUSE OF ACTION

**Tortious Interference With Prospective Economic Advantage**

**(All Defendants)**

123.    OpticsML incorporates all of the above paragraphs as though fully set forth therein.

124.    OpticsML has relationships with prospective customers and others in the mortgage industry and larger real estate industry.  These contracts and economic relationships are of

economic benefit to OpticsML and contain the likelihood of future economic advantages to OpticsML.

125.     Defendants all have knowledge that OpticsML has relationships with prospective customers and others in the mortgage industry and larger real estate industry and, in fact, entered into a relationship with OpticsML specifically based on one such relationship.

126.     Defendants tortiously interfered with OpticsML's prospective economic advantage of this knowledge by preventing OpticsML from marketing, selling or licensing its services and intellectual property to others in the mortgage industry and larger real estate industry through its misrepresentations.

127.     As the direct and proximate result of Defendants' conduct, OpticsML has suffered and, if Defendants' conduct is not stopped, will continue to suffer severe competitive harm, irreparable injury, and significant damages in an amount to be proven at trial.

128.     OpticsML also seeks damages for the unjust enrichment of Defendants by having access to OpticsML's services and intellectual property without the payment of just compensation from 2016 through the present, on a continuing basis, in an amount to be proven at trial.

### FOURTH CAUSE OF ACTION

**Fraud and Misrepresentation**

**(All Defendants)**

129.     OpticsML incorporates all of the above paragraphs as though fully set forth therein.

130.     Through fraud and misrepresentation of their true purpose, OpticsML provided services and intellectual property to Defendants in good faith throughout 2017, 2018 and into 2019, including by enabling OpticsML's servers to apply Machine Learning and Natural Language Processing to mortgage documents (supplied by Defendant Rocktop), enabling Rocktop to create a "due diligence and analytics platform" (the "Platform") to conduct its business, which it marketed to investors and publicly on its website.

131.    In order to induce OpticsML to provide its services and intellectual property, Defendants made a number of fraudulent statements and misrepresentations, including that the parties would enter into a "partnership" as expressly contemplated by their written agreement.

132.    Defendants made these representations knowing that it intended to acquire, use, and disclose the services provided without just compensation.

133.    Defendants made these representations intending that OpticsML would rely on them, and knowing that without them, OpticsML would not agree to a written agreement to provide its services and intellectual property to Defendants, and would not provide confidential information to Defendants.

134.    OpticsML justifiably relied on Defendants' representations about how it would use OpticsML's service, intellectual property, and confidential information.

135.    Defendants made these representations in furtherance of Defendants' shared goal of obtaining this confidential information.

136.    Defendants had no intention of entering into any "partnership" or exclusive license as required by the parties' written agreement, or paying OpticsML appropriate compensation.

137.    OpticsML was injured when it made its confidential information available to Defendants and that information was misappropriated for the benefit of Defendants.

138.    As the direct and proximate result of Defendants' conduct, OpticsML has been damaged, and Defendants have been unjustly enriched at OpticsML's expense in an amount to be proven at trial.

## FIFTH CAUSE OF ACTION

### Breach of Contract

### (All Defendants)

139.    OpticsML fully incorporates all the above paragraphs as fully set forth herein.

28

140.    The Master Services Agreement ("MSA") (Exhibit A) constituted a valid and enforceable contract between OpticsML and the Defendants.

141.    OpticsML fully performed all of its obligations, and more so, pursuant to the MSA.

142.    Pursuant to Section 6(a) of the MSA, Defendants were obligated, and contracted, to acknowledge and execute all documents necessary to confirm, or perfect, the exclusive ownership by OpticsML of all the Work Product created by OpticsML and as defined within the MSA.

143.    Pursuant to Section 6(c) of the MSA, Defendants were obligated, and contracted, to negotiate in good faith in terms of an exclusive license to the Work Product and OpticsML's intellectual property and trade secrets as contemplated and described under the MSA.

144.    Despite Defendants aforementioned termination of the contract in August 2019 (*supra* ¶¶ 9, 10), pursuant to Section 6(e) the Sections 6(a) and 6(c) survive termination of the Agreement.

145.    Accordingly, Defendants are in breach of at least these two provisions of the MSA as they have continually refused to acknowledge and execute documents necessary to confirm an OpticsML ownership of all Work Product and Intellectual Property and have continually refused, despite repeated requests, to negotiate in good faith the terms of an exclusive license to same.

146.    As a direct and proximate result of Defendants breach of the MSA, OpticsML has been damaged, suffered actual monetary loss, and suffered additional damages in an amount to be proven at trial.

## SIXTH CAUSE OF ACTION

### Theft Liability Act Under Tex. Civ. Prac. & Rem. Code §§ 134.001-134.005

### (All Defendants)

147.    OpticsML fully incorporates all the above paragraphs as fully set forth herein.

148.    At all times relevant to OpticsML was the owner of and had property interest in its intellectual property, trade secrets, and Work Product as defined under the MSA.

149.    Defendants wrongfully, and without OpticsML's consent, have knowingly stolen and claimed as their own OpticsML aforementioned intellectual property and trade secrets.

150.    Upon information and belief, Defendants have intentionally and wrongfully made multiple copies of OpticsML's intellectual property and trade secrets.

151.    Defendants' taking and theft of said intellectual property and trade secrets was made with the intention to deprive OpticsML of its rightful property and to avoid paying OpticsML for appropriate services rendered.

152.    As a result, OpticsML has sustained significant loss and is subject to recover actual damages, exemplary damages, and all reasonable and necessary attorney's fees, in an amount to be proven at trial.

## SEVENTH CAUSE OF ACTION

### Quantum Meruit

### (All Defendants)

153.    OpticsML fully incorporates all the above paragraphs as fully set forth herein.

154.    OpticsML has provided extremely valuable and unique services to Defendants through its intellectual property and trade secrets used to assist Defendants' business endeavors. These services were provided specifically for Defendants' benefit.

155.    Defendants accepted these materials and services, recognizing their value, and have been on reasonable notice since and despite the termination of the MSA as cited herein, that OpticsML expects and is entitled to compensation for services and value rendered.

156.    Despite this, Defendants continually refused to adequately and justly compensate OpticsML for these services and as such OpticsML is entitled to recover actual damages for the reasonable value of the services, intellectual property and trade secrets that have been provided.

157.    Therefore, in an amount that will be determined at trial, OpticsML will ask for and seek to recover actual damages, loss, and reasonable and necessary attorney's fees.

**PRAYER FOR RELIEF**

WHEREFORE, OpticsML prays for judgment against Defendant Rocktop as follows:

1.      Judgment in OpticsML's favor and against Defendants on all causes of action alleged herein;

2.      For damages in an amount to be further determined at trial;

3.      For preliminary and permanent injunctive relief to (1) prevent Defendants from using any OpticsML trade secrets in any way, including in developing, designing, or machine training any mortgage or analytic technology or products, (2) prevent the disclosure of OpticsML Trade Secrets and confidential information, (3) prevent the destruction and deletion of any of the OpticsML Trade Secrets currently in Defendants' possession, and (4) mandate the return of all OpticsML Trade Secrets and confidential information, such as but not limited to all source code supplied by, taken from, or enabled by Defendants' impermissible access and misappropriation of OpticsML Trade Secrets;

4.      For punitive damages;

5.      For prejudgment interest;

6.      For attorneys' fees and costs; and

7.      For such other and further relief as the Court may deem to be just and proper.


**DEMAND FOR JURY TRIAL**

OpticsML hereby demands trial by jury for all causes of action, claims or issues in this action that are triable as a matter of right to a jury.

 February 22, 2021                                    Respectfully submitted,

                                                     */s/Eric H. Findlay*
                                                     Eric H. Findlay

Texas State Bar No. 00789886
Brian Craft
Texas State Bar No. 04972020
Findlay Craft, P.C.
102 North College Avenue, Suite 900
Tyler, Texas 75702
903-534-1100
903-534-1137 fax
efindlay@findlaycraft.com

***Attorneys for Plaintiff***
***Pairprep Inc., d/b/a OpticsML***

*Of Counsel:*

Bijal V. Vakil
White & Case LLP
3000 El Camino Real
2 Palo Alto Square, Suite 900
Palo Alto, CA  94306
(650) 213-0300
bijal@whitecase.com